**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| AE LIQUIDATION, INC., et al. | ) | Case No. 08-13031 (MFW) |
| | ) | |
| Debtors | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| JEOFFREY L. BURTCH, | ) | |
| CHAPTER 7 TRUSTEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 10-55502 (MFW) |
| | ) | |
| TEXSTARS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**[1]

Before the Court is the Complaint of Jeoffrey L. Burtch, the Debtors'[2] chapter 7 trustee (the "Trustee"), seeking to avoid preferential transfers against Texstars, Inc. ("Texstars"). After a trial on the merits, and for the reasons set forth below, the Court concludes that judgment should be entered for Texstars.

I.   FACTUAL BACKGROUND

Eclipse developed and manufactured private jets known as the Eclipse 500.  Texstars manufactured composite parts that were

---

[1]  This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2]  The Debtors are AE Liquidation, Inc. (f/k/a Eclipse Aviation Corporation) and its wholly owned subsidiary EIRB Liquidation, Inc. (f/k/a Eclipse IRB Sunport, LLC) (collectively "Eclipse").

designed specifically for the Eclipse 500.  These parts were
furnished to Eclipse pursuant to a long-term agreement dated
March 9, 2006, which provided for net-30 day payment on all
invoices (the "Agreement").

During their business relationship, Eclipse's payment of
invoices was inconsistent.  Eclipse routinely paid invoices to
Texstars outside the net-30 day terms of the Agreement and
routinely paid multiple invoices with one check.  By November
2007, Eclipse had several invoices with Texstars that were over
120 days.  As a result, Texstars sent emails to Eclipse advising
that its account was "outside agreed terms and conditions" and
needed to "be brought current as soon as possible."  (Def. Ex.
H.)  Texstars also sent a letter warning that "if Eclipse [did]
not fully cure this non-payment, Texstars would terminate the
Agreement."  (Def. Ex. P.)  Eclipse ultimately cured this
default, and Texstars did not terminate the Agreement.

In June 2008, Eclipse again began having financial
difficulties.  Despite original manufacturing projections of 83
aircraft a month, in June 2008 Eclipse built only 19 planes.
(Pl. Ex. 41.)  In August 2008, Eclipse reduced its projections to
4 aircraft per month for the balance of 2008.  (Pl. Ex. 41.)

In August 2008, an Eclipse representative notified Texstars
by phone that Eclipse would no longer be accepting product and
would be stopping production.  (Tr. 5/10/2013 at 28.)  On August

2

18, 2008, Eclipse sent a letter to Texstars and its other suppliers notifying them of Eclipse's plan to slow production through the end of 2008 with the intent of revamping production in 2009. Id. This letter also stated that Eclipse intended to pay suppliers upfront for new parts and support and to pay off old accounts within sixty days of receiving new financing. Id. The letter indicated that Eclipse expected this new financing to come through in October 2008. Id.

On August 18, 2008, Texstars sent a letter to Eclipse addressing Elipse's "continuing failure to maintain its accounts receivable current with Texstars" and Eclipse's projected cessation of production. Texstars advised that to restart production would "require the payment by Eclipse of all outstanding invoices and accounts receivable." (Pl. Ex. 30.) After receiving this letter from Texstars, Eclipse made ten payments to Texstars totaling approximately $1.4 million in satisfaction of 241 invoices.

On November 25, 2008, Eclipse filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date"). On March 5, 2009, the case was converted to chapter 7 and the Trustee was subsequently appointed.

Within the 90 days preceding the Petition Date (the "Preference Period"), Eclipse made nine transfers to Texstars totaling $781,702.61 (the "Transfers"):

3

| Check Number | Check "Cut" Date | Check "Clear" Date | Check Amount |
|---|---|---|---|
| 56943 | 8/28/2008 | 9/2/2008 | $320,087.23 |
| 57066 | 9/3/2008 | 9/9/2008 | $314,167.14 |
| 57216 | 9/10/2008 | 9/11/2008 | $199,346.79 |
| 57267 | 9/17/2008 | 9/18/2008 | $201,309.52 |
| 57404 | 9/24/2008 | 9/25/2008 | $50,481.62 |
| 57525 | 10/1/2008 | 10/2/2008 | $102,326.82 |
| 57976 | 10/15/2008 | 10/17/2008 | $59,288.54 |
| 58080 | 10/22/2008 | 10/27/2008 | $32,475.86 |
| Wire | 10/30/2008 | 10/30/2008 | $21,512.20 |

Also during the Preference Period, Texstars provided $164,654 in new value to Eclipse.[3]

On November 19, 2010, the Trustee commenced the instant adversary proceeding by filing a Complaint against Texstars asserting that the Transfers were avoidable as preferences under section 547(b) of the Bankruptcy Code. On March 14, 2011, Prudential filed an Answer to the Complaint in which it admitted receipt of the Transfers, but denied all other allegations. Texstars also asserted defenses under section 547(c)(2) and (4).

On May 20, 2013, a trial was held, after which the Court took the matter under advisement. Post-trial briefing was completed on August 12, 2013, and the matter is ripe for decision.

---

[3] Although the parties originally disputed the amount of Texstars' new value defense, the Trustee has now conceded it to be the amount asserted by Texstars.

4

II.   <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(1).  This proceeding is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A) & (F).

III. <u>DISCUSSION</u>

In the Joint Pretrial Order, Texstars conceded that all the elements of a preferential transfer under section 547(b) of the Bankruptcy Code have been met.  At the pretrial conference on May 15, 2013, the Trustee conceded Texstars' new value defense under section 547(c)(4) in the amount of $164,654.  Thus, the only issues remaining before the Court are: (1) whether the Transfers fit within the ordinary course of business defense under section 547(c)(2); and (2) if the Transfers were outside the ordinary course of business, whether the Trustee is entitled to prejudgment interest on the avoided Transfers.

A.   <u>Ordinary Course of Business Defense</u>

Section 547(c)(2) permits a "safe harbor" for a transferee of a preferential payment if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," and such transfer was (A) "made in the ordinary course of business or financial affairs of the debtor and the transferee," or (B) made

according to "ordinary business terms" of the parties or the
industry.  11 U.S.C. § 547(c)(2).  The burden is on the
transferee to prove by a preponderance of the evidence that the
transaction between the creditor and debtor meets the ordinary
course defense.  <u>Miller v. Westfield Steel, Inc. (In re Elrod
Holdings Corp.)</u>, 426 B.R. 106, 110-11 (Bankr. D. Del. 2010).

     The ordinary course of business exception is designed to
balance the interests of the debtor and creditors.  <u>Fiber Lite
Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical
Prods., Inc.)</u>, 18 F.3d 217, 219 (3d Cir. 1994).  In <u>Molded
Acoustical</u>, the Third Circuit stated:

>     [T]he preference rule aims to ensure that creditors are
>     treated equitably, both by deterring the failing debtor
>     from treating preferentially its most obstreperous or
>     demanding creditors in an effort to stave off a hard
>     ride into bankruptcy, and by discouraging the creditors
>     from racing to dismember the debtor.  On the other
>     hand, the ordinary course exception to the preference
>     rule is formulated to induce creditors to continue
>     dealing with a distressed debtor so as to kindle its
>     chances of survival without a costly detour through, or
>     a humbling ending in, the sticky web of bankruptcy.

<u>Id.</u>  The Court must be cognizant of a debtor's need to maintain
constructive relationships with certain creditors.  Thus, when a
debtor-creditor relationship "has been cemented long before the
onset of insolvency . . . we should pause and consider carefully
before further impairing a creditor whose confident, consistent,
ordinary extension of trade credit has given the straitened
debtor a fighting chance of sidestepping bankruptcy and

continuing in business." Id. at 224-225.

The Trustee does not dispute that the Transfers were on account of debt incurred by Eclipse in the ordinary course of business. Texstars is in the business of manufacturing composite aircraft parts, which Eclipse regularly purchased for use on its Eclipse 500 jets. The business relationship between the parties began in March 2006 and continued more than two years. For these reasons, the Court finds that the first prong of section 547(c)(2) is satisfied.

As to the second requirement of section 547(c)(2), Texstars does not contend that the Transfers were made according to "ordinary business terms" of the industry pursuant to section 547(c)(2)(B). Rather, Texstars argues that the Transfers were made in the ordinary course of business between the parties pursuant to section 547(c)(2)(A).

The determination of whether a creditor has met its burden under section 547(c)(2)(A) is a subjective test involving the consistency of transactions between the creditor and the debtor before and during the preference period. SEC v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.), 180 F.3d 504, 512 (3d Cir. 1999). Courts have considered several factors in determining such consistency: (i) the length of time the parties engaged in the type of dealing at issue; (ii) whether the subject transfers were in an amount more than usually paid; (iii) whether

the payments at issue were tendered in a manner different from previous payments; (iv) whether there appears to have been an unusual action by the creditor or debtor to collect on or pay the debt; and (v) whether the creditor did anything to gain an advantage (such as obtain additional security) in light of the debtor's deteriorating financial condition.  See Burtch v. Detroit Forming, Inc. (In re Archway Cookies), 435 B.R. 234, 241-42 (Bankr. D. Del. 2010); Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Del., Inc.), 320 B.R. 541, 548-49 (Bankr. D. Del. 2004).  No one factor is determinative.  Rather, the Court should consider the parties' relationship in its entirety.  Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.), 463 B.R. 302, 306 (Bankr. D. Del. 2010).

      1.  Length of Engagement

In determining whether a creditor can sustain a defense under section 547(c)(2)(A), the Court must first look to the length of the parties' business relationship.  Sass v. Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.), 476 B.R. 124, 136 (Bankr. D. Del. 2012).  The Court should determine whether the relationship was "of recent origin," as opposed to being "cemented long before the onset of insolvency."  Molded Acoustical, 18 F.3d at 225 ("Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing

relationships on level terms, relationships which if encouraged
will often help a business fend off an unwelcome voyage into the
labyrinths of a bankruptcy.").

In the case at bar, Texstars supplied Eclipse with composite
parts for the Eclipse 500 jet for two years.  The parties engaged
in numerous transactions over this period.  The Court finds that
this lengthy relationship was sufficient to establish an ordinary
course of dealing between the parties.  See, e.g., Troisio v.
E.B. Eddy Forrest Prods. Ltd., (In re Global Tissue, L.L.C.), 302
B.R. 808, 814 (D. Del. 2003) (holding that the parties'
relationship of 15 months was sufficient); Unsecured Creditors'
Comm. v. CBA Indus., Inc. (In re Color Title, Inc.), 239 B.R.
872, 875 (Bankr. D. Del. 1999) (holding that a relationship that
existed for nearly three years was long enough).

2.   Similarity of Transfers

Next, the Court must compare transfers made within the
preference period to those made in the course of dealing between
the parties prior to the preference period.  "Courts place
particular importance on the timing of payment" in determining
the ordinary course of business between parties.  Archway
Cookies, 435 B.R. at 243 (quoting Radnor Holdings Corp. v. PPT
Consulting, LLC (In re Radnor Holdings Corp.), Adv. No. 08-
51184(PJW), 2009 WL 2004226, at *5 (Bankr. D. Del. July 9, 2009).
Small deviations in timing might not preclude a finding of

ordinariness, while greater deviations in timing are more likely to preclude a finding of ordinariness.  Archway Cookies, 435 B.R. at 243.  Overall, this inquiry is intensely fact specific. Goldstein v. Starnet Capital Grp., LLC (In re Universal Mktg., Inc.), 481 B.R. 318, 327 (Bankr. E.D. Pa. 2012).

The Trustee argues that payments made during the Preference Period were made more quickly and more frequently than those in the pre-Preference Period.  Texstars counters that the small deviation in the timing of payments made during the Preference Period is statistically insignificant and thus does not weigh against an ordinary course of business defense.

The Trustee calculated payment timing based on the invoice and check "cut" date, for a Preference Period average of 41.98 days and pre-Preference Period average of 49.68 days from invoice to check cut date.  This represents a 15% quicker rate of payment in the Preference Period.  The Trustee also notes that, while the range of payment timing spanned from 16 to 456 days prior to the Preference Period, the Preference Period payments fell within the range of 1 to 117 days.

In response, Texstars argues that the "clearing date" of the Transfers is the relevant measure, which results in 45 days between invoice and payment in the Preference Period and 50.2 days between invoice and payment in the pre-Preference Period, or approximately 10% quicker Preference Period payments.  Texstars

10

also asserts that all but nine of the hundreds of invoices paid during the Preference Period fall within the eighteen to eighty-two day standard deviation of payment that existed during the pre-Preference Period.

The Court agrees with Texstars that the relevant date for comparison is the clear date rather than cut date, because a creditor is not paid until the check actually clears.  If the cut date is used, the calculation could be skewed by the debtor holding the check, by a delay in mail service, and other factors. Regardless of which calculation of payment period is used, however, the Court does not find that a 10 to 15% quicker payment time is significant, given the large deviation in payment timing over the parties' course of dealing (1 to 456 days).

The parties also argue whether the frequency with which Eclipse remitted payment to Texstars is significant.  The Trustee argues that, in the Preference period, Eclipse made all but one of its payments (or 89%) to Texstars on a weekly basis.  In response, Texstars argues that weekly payments by Eclipse were not unusual in the pre-Preference Period either: thirty-seven of the sixty-one checks (or approximately 61%) during the pre-Preference Period were made within a week of the preceding or following check.  Texstars also identifies several extended periods of time in which checks were paid on a weekly basis.

Given the frequency with which Eclipse wrote checks to

11

Texstars on a weekly basis in the pre-Preference Period, the
Court concludes that the weekly payments to Texstars in the
Preference Period do not weigh against the ordinariness of the
Transfers.

     3.  <u>Manner of Tender</u>

This factor considers whether any of the Transfers were
tendered differently during the Preference Period.  <u>See</u> <u>Am. Home</u>
<u>Mortg.</u>, 476 B.R. at 139.  In this case, six of the eight
Preference Period checks sent to Texstars cleared one or two days
after the check "cut" date, and the final payment was by wire
transfer.  The Trustee argues that these overnight payments and
wire transfer were outside the normal course of business between
the parties.

Texstars does not address the overnight checks, but asserts
that Eclipse made its last payment by wire at its own discretion,
and that a change in the method of payment does not itself take
payments out of the ordinary course of business.  <u>Logan Square E.</u>
<u>v. Peco Energy Co. (In re Logan Square E.)</u>, 254 B.R. 850, 856
(Bankr. E.D. Pa. 2000) (holding that while not dispositive, the
debtor's payment by cashier's check was a factor the court could
consider); <u>Scroggins v. BP Exploration & Oil, Inc. (In re Brown</u>
<u>Transp. Truckload, Inc.)</u>, 161 B.R. 735, 740 (Bankr. N.D. Ga.
1993) (holding that simple changes in the method of payment by a

debtor to a creditor are not enough to make the transaction extraordinary).

The Court concludes that the change in payment method for the sole wire transfer is not significant, where, as here, Texstars did not request payment by wire transfer.[4]  See Burtch v. Prudential Real Estate and Relocation Services, Inc. (In re AE Liquidation, Inc.), 08-13031(MFW), 2013 WL 3778141, at * 7 (Bankr. D. Del. July 17, 2013) ("Because Prudential did not insist on the change in payment method, which lasted only three weeks, the last three Transfers will not be considered out of the ordinary course of business for this reason alone.").

As Texstars presented no evidence regarding the existence or frequency of overnight check payment prior to the Preference Period, the Court cannot analyze whether such payments are consistent with the ordinary course of business between the parties.[5]  However, because the Court concludes that the timing of payment was not significantly different during the Preference Period, it cannot conclude that the manner of payment (overnight) took the payments outside of the ordinary course of business.

---

[4]  The Trustee does not argue, or submit any evidence, that Texstars insisted on payment by wire transfer.

[5]  The burden is on the Defendant to prove a section 547(c) defense.  11 U.S.C. § 547(g); Elrod Holdings, 426 B.R. at 110-11; Am. Home Mortg., 476 B.R. at 135.

4.   <u>Collection Efforts</u>

Unusual collection activity between a debtor and creditor in the preference period can defeat an ordinary course defense. <u>Montgomery Ward, LLC v. OTC Int'l, Ltd. (In re Montgomery Ward, LLC)</u>, 348 B.R. 662, 678 (Bankr. D. Del. 2006).  Unusual action can include "the potential manipulation of the credit schedules, the threat or initiation of legal action or other unusual behavior designed to improve the lot of one creditor at the expense of the others."  <u>Molded Acoustical</u>, 18 F.3d at 225. Telephone calls and other communications may be considered unusual if they represent "a calculated response to a deteriorating creditor-debtor relationship."  <u>Am. Home Mortg.</u>, 476 B.R. at 139.  The Trustee argues that Texstars' August 18, 2008, letter constituted an unusual collection effort sufficient to bring the Preference Period payments outside the ordinary course of business between the parties.

Upon learning that Eclipse would continue to slow down its production through the fall of 2008 and would no longer accept product from Texstars, Texstars sent a letter to Eclipse stating:

> This letter serves as [Texstars'] notice to [Eclipse] of [Eclipse's] continuing failures to maintain its accounts receivable current with Texstars' and of other material breaches of the [Agreement].
> Despite repeated assurances by Eclipse that its accounts with suppliers would be maintained as current and that its production schedule would continue to "ramp up" as described in numerous meetings conducted by Eclipse management, it is now clear that neither of those representations is true.  Eclipse has failed to

14

maintain its account receivables with Texstars as
current and, on August 13, 2008, Eclipse advised its
suppliers of the complete reversal of its production
schedule . . . .
     Consequently, in accordance with your request that
suppliers respond to Eclipse's radical departure . . .
from its previous production schedules, Texstars hereby
notifies Eclipse that Texstars will rightsize its
business to reflect Eclipse's minimal demand.  To
restart the cell . . . will require the payment by
Eclipse of all outstanding invoices and accounts
receivable . . . and a new form of agreement . . . .

(Pl. Ex. 30.)

     Texstars denies that this letter was an unusual

collection effort.  In fact, Texstars' trial witness

testified that the letter was not intended as a demand for

immediate payment.  (Tr. 5/20/2013 at 31.)  Rather, Texstars

argues that the letter was merely designed to inform Eclipse

of the costs that would be incurred as a result of a shut

down and subsequent restart of production.  As evidence,

Texstars points to the November 5, 2007, collection letter,

which, in contrast, threatened termination of the Agreement

unless receivables were made current.  (D. Ex. P.)  In the

2007 Letter, Texstars wrote: "This serves as Texstars'

notice to [Eclipse] of Eclipse's failure to pay and of

pending Material Breach . . . .  Further notice is hereby

provided that if Eclipse does not fully cure this non-

payment . . . Texstars will serve notice of termination of .

. . the Agreement."  Id.

The Court agrees with Texstars.  The August 18 Letter
was in response to Eclipse's announced production slow down,
in contrast to the 2007 Letter, which was sent solely in
response to Eclipse's failure to keep current on its
account.  While the August 18 Letter complains about
Eclipse's "continuing failures to maintain its accounts
receivable . . . and of other material breaches," it does
not demand immediate payment or threaten to terminate the
Agreement.  It advises Eclipse that Texstars cannot restart
production of the Eclipse 500 parts unless all Eclipse's
outstanding accounts receivable are paid in full and a new
agreement is reached.  However, Texstars does not insist on
payment before other creditors nor complain of Eclipse's
estimated repayment schedule (October 2008).

In addition, even if the August 18 Letter were unusual
collection activity, the Court must still determine whether
the Transfers were sent in response to Texstars' collection
effort.  See In re Craig Oil Co., 785 F.2d at 1566.
("[W]henever the bankruptcy court receives evidence of
unusual collection efforts, it must consider whether the
debtor's payment was in fact a response to such efforts.").

As discussed above, the payments made by Eclipse after
the August 18 Letter (during the Preference Period) did not

16

differ significantly from the payments made during the pre-
Preference Period.  While Eclipse's accounts receivable
balance was reduced during the Preference Period, that was
caused in large part by the fact that Eclipse did not buy
new product.  See, e.g., HLI Creditors Trust v. Metal Techs.
Woodstock Corp. (In re Hayes Lemmerz Int'l, Inc.), 339 B.R.
97, 109 (Bankr. D. Del 2006) ("The fact that Defendant
significantly reduced its receivables from Debtor during the
preference period may be due in part to the fact that Debtor
ordered and was shipped substantially less during that
period.").  Because there is no statistically meaningful
difference in the amounts or timing of the payments
following Eclipse's receipt of the August 18 Letter from
those that preceded the Letter, the Court cannot conclude
that the Transfers were paid as a response to the Letter.

  5. <u>Advantage in Light of Eclipse's Condition</u>

  A creditor may attempt to take advantage of a debtor's
financial condition by requesting additional collateral or
security, imposing late fees, or pressuring the debtor for
payment.  <u>Am. Home Mortg.</u>, 476 B.R. at 140.  Additionally, a
creditor's awareness of the debtor's financial condition can
indicate that the creditor is attempting to collect a debt
ahead of other creditors.  <u>Id.</u>  However, if the parties had
the same relationship for a substantial time frame prior to

17

the debtor's insolvency, actions that appear to take
advantage of the debtor may still be in the ordinary course
of business.  <u>Color Tile, Inc. v. CBA Industries, Inc. (In
re Color Tile)</u>, 239 B.R. 872, 875 (Bankr. D. Del. 1999).

The Trustee argues that Texstars sent the August 18
Letter in response to Eclipse's declining financial
situation and production slow-down to ensure that Texstars'
outstanding accounts receivable would be paid.  The Trustee
asserts that Texstars was aware of Eclipse's declining
financial position.  To support this assertion, the Trustee
points to several news articles reporting the resignation of
Vern Raburn as Eclipse's CEO, cancellations of Eclipse 500
orders, delays in delivery of Eclipse jets, the "release" of
approximately 190 temporary Eclipse employees, and an
announcement of "cashflow problems." (Pl. Ex. 38.)  The
Trustee also notes Eclipse's extreme slow down in
production, of which Texstars was plainly aware, as evidence
of Eclipse's deteriorating condition.

Texstars, on the other hand, argues that the August 18
Letter was merely designed to express displeasure at
Eclipse's slow down in production.  Texstars asserts that it
was led to believe by Eclipse that Eclipse would be
receiving new financing and revamping production in the
future.  Such a revamp would have been the only way for

18

Texstars to recoup costs it had incurred as an Eclipse
supplier.  (Tr. 5/20/2013 at 60 ("[T]he only way Texstars
was going to recover is for Eclipse to be successful.").)
Texstars notes that the August 18 Letter did not demand a
change in payment practices or condition the continuing
supply of goods and services on accelerated payment of
outstanding accounts.

     The Court concludes that, while Texstars was aware of
Eclipse's financial problems, it did not seek to take
advantage of Eclipse's position to the detriment of other
creditors.  It did not seek immediate payment and instead
simply accepted Eclipse's promise to repay it when it
obtained refinancing.

     Texstars' demand for payment of all of Eclipse's
accounts before Texstars would restart its production cell
is not relevant.  Eclipse was never able to revamp its
production and thus did not require Texstars to manufacture
any further component parts.

     For the foregoing reasons, the Court concludes that
Texstars has established that the Transfers were within the
ordinary course of business of the parties and not subject
to avoidance by the Trustee.

V.    <u>CONCLUSION</u>

    For the reasons stated above, the Court will enter judgment in favor of Texstars.

Dated:  October 2, 2013    BY THE COURT:

                              Mary F. Walrath
                              United States Bankruptcy Judge